IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. 12-cv-02395-JLK

**SUMMIT BANK & TRUST, a Colorado Corporation,**

Plaintiff,

v.

**AMERICAN MODERN HOME INSURANCE COMPANY, an Ohio Corporation,**

Defendant.

_____

**ORDER DENYING AHMIC'S MOTION FOR SUMMARY JUDGMENT FOR FAILURE
TO COMPLY WITH INSURANCE POLICY TERMS**
_____

Kane, J.

This case involves a disputed insurance claim for losses incurred by the burglary

of a large vacant building in Greeley, Colorado.  Defendant American Modern Home

Insurance Company ("AMHIC") moves for summary judgment, Doc. 55, against Plaintiff

Summit Bank & Trust ("Summit"), which brings the following four claims: bad faith

breach of insurance contract, breach of contract, violations of C.R.S. § 10-3-1115 and

1116, and declaratory judgment per 28 U.S.C. § 2201and Fed. R. Civ. P. 57.  AMHIC

argues that Summit's claims must fail because Summit did not comply with terms of the

insurance policy. Based on the following, I DENY the Motion.

## I.    JURISDICTION AND VENUE

I have personal jurisdiction over AMHIC as: (a) it did business in the State of

Colorado at times material to this action; (b) it purposefully availed itself of the rights and privileges of the State of Colorado at times material to this action; and (c) it committed the acts described below with resulting consequences in the State of Colorado.

I have subject matter jurisdiction over this matter per 28 U.S.C. § 1332 as the amount in controversy exceeds the sum of $75,000, and Summit and AMHIC are citizens of different states. I have supplemental jurisdiction over all other claims per 28 U.S.C. § 1367 as they form part of the same case or controversy. Per 28 U.S.C. § 1391, venue is proper in the District of Colorado as: (a) AMHIC transacted business in the State of Colorado, and (b) the events and omissions giving rise to Summit's claims occurred in the State of Colorado.

## II.     SUMMARY JUDGMENT STANDARD AND RULES OF INSURANCE CONTRACT INTERPRETATION

I repeat the catechism that summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Adamson v. Multi. Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir.2008). A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Adamson*, 514 F.3d at 1145. In weighing these standards, I draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The meaning of each term in an insurance contract is to be determined as a matter of Colorado law, with any ambiguity resolved in favor of Summit, as the insured. *See*

*Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1141 (10th Cir.2008). Mere disagreement between the parties about the meaning of a term, however, does not create ambiguity. *Union Rural Elec. Ass'n v. Public Utils. Comm'n*, 661 P.2d 247,251 (Colo.1983). One may not read an ambiguity into a term where none exists in order then to resolve the resulting ambiguity against the insurer. *Martinez v. Hawkeye–Sec. Ins. Co.*, 195 Colo. 184, 576 P.2d 1017,1019 (1978) ("[C]ourts will not force an ambiguity in order to resolve it against an insurer.").  Also, the mere fact that a term may be susceptible to multiple interpretations, or that it may have different dictionary definitions in different contexts, does not alone create an ambiguity. *See id.*; *see also Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo.App.1996). To the contrary, and as a matter of basic semantics, a term is only ambiguous when it is reasonably susceptible to multiple interpretations in the context in which it is used. *Juniel*, 931 P.2d at 513; *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo. 1990).

　　　To ascertain whether a certain provision is ambiguous, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement." *Radiology Professional Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 256, 577 P.2d 748, 750 (1978)(*citing Christmas v. Cooley*, 158 Colo. 297, 406 P.2d 333 (1965)).  While exclusionary clauses exempting the insurer from providing coverage in certain circumstances must be written in clear and specific language and construed in favor of coverage, a court may not add, delete, or rewrite terms to extend coverage. *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 523 (Colo. App. 2004).  The

review of the contract must strive to give effect to all provisions so that none is rendered

meaningless. *Chandler-McPhail v. Duffey*, 194 P.3d 434, 437 (Colo.App.2008).

### III.    FACTS

City Center West LP ("CCW") is the owner of a former Hewlett-Packard scanner

manufacturing facility located at 700 71st Avenue, Greeley, CO 80634 (the "Property").

Summit is the mortgagee and holds a first deed of trust on the Property.  Because CCW

had failed to maintain property insurance coverage for the Property, Summit as

mortgagee force placed an insurance policy on the Property. Specifically, Summit

obtained a Blanket Mortgage Security Insurance Policy, No. BM- 14-6835-0836 (the

"Policy"), from AMHIC for the Property.  The premium for the Policy has been paid and

the Policy period extends from April 27, 2009 to until it is cancelled.

The Policy provided coverage for damage caused by vandalism or malicious

mischief, which was defined as "the willful and malicious damage to or destruction of the

property covered."  The Policy delimited that coverage, however, by stating that AMHIC

shall not be liable for loss if the Property has been vacant[1] beyond a period of 30

consecutive days immediately preceding the loss, unless AMHI has been notified of such

vacancy, the appropriate premium has been paid therefore and Summit had secured the

Property and conducted periodic inspections of the interior and exterior.  The Policy did

not specify the method or means by which the Property should be secured or the

frequency of the periodic inspections required.

---

[1] The Policy defines "vacant" as "containing no contents or only minimal contents pertaining to operations or activities customary to occupancy of the building." It is undisputed that the Property meets this definition.

The Policy also contained a clause enumerating certain duties that the insured and its mortgagor must comply with after a loss. One of these duties is "produce for examination, with permission to copy, all records and documents that we may require." The Policy further provides that "No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the loss."

The 270,000 square foot Property consists of multiple buildings, multiple levels, and multiple wings, bays, labs, and rooms. In May 2011, the electricity to the Property was shut off by CCW rendering the magnetic locking system on the doors inoperable. With the magnetic locks no longer effective, CCW fastened the doors shut with metal chains. The police reports indicate that several doors were fastened with "twine or chain." Mr. Ron Maes, the Property's maintenance person, states that twine was never used, but that cables were used and also chains. Further, Mr. Maes explains that some doors were fastened with metal locks (the kinds with keys, e.g. Master Lock®), hasps, plates, and deadbolts. There was no alarm system or video surveillance at the Property at the time of the burglary. No representative of CCW or Summit conducted any inspection of the interior or exterior of the Property between July 8, 2011 and when the burglary was discovered by Mr. Maes on September 23, 2011.

Between July 8, 2011 and September 23, 2011, therefore, the Property was broken into and burglarized (the "Incident"). The insurance claim at issue in this action concerns this Incident. Copper piping and conduit, among other things, were stolen from the Property. The burglars damaged the Property to extract the copper piping and conduit.

At least some portion of the damages to the Property was caused by theft and burglary. Before the Incident, there had been two other occurrences where individuals had broken into the building and damaged the Property, but Summit did not believe the losses from these occurrences exceeded the Policy deductible of $20,000 and did not report them.

Summit submitted a claim based on the damage caused by this burglary to AMHIC.  After receipt of the claim, AMHIC requested documentation relating to the security in place at the Property prior to the burglary, as well as inspections that were conducted, on November 8, 2011, February 6, 2012, February 21, 2012, February 24, 2012, March 20, 2012, and September 10, 2012.  Summit did not respond to these repeated written requests.  Summit did, however, discuss with AHMIC verbally the security in place at the time of the Incident and offered AMHIC full access to the Property. AMHIC accepted that offer and, on October 17, 2011, Mr. Maes guided AMHIC's claims adjustor on her three-hour inspection of the Property, during which time she documented the damage with 150 photographs.

One week later, Mr. Maes followed-up with AMHIC's claims adjustor and indicated that CCW retained a cost-to-repair expert , Todd Hager, to assess the Property for damage. On November 3, 2011, AMHIC's claims adjustor spoke with Mr. Hager, who provided AMHIC with a verbal assessment of the damage following his own inspection. A written assessment was prepared by Mr. Hager and submitted to AMHIC in mid-November 2011 and a cost-to-repair estimate was submitted in late December 2011. The primary assessment included an overview of the damage with photographic

references.   During a follow-up inspection on November 29, 2011, Mr. Hager toured the Property with AMHIC's senior claims adjustor, Randy Beal.

On November 18, 2011, Mr. Klein discussed the security at the Property with AMHIC's claims adjustor. On January 3, 2012, Mr. Klein participated in a follow-up conversation with AMHIC about the claim. On January 11, 2012, AMHIC's claims adjustor followed-up with Mr. Maes and asked him questions about security and inspections. In its records from that conversation, AMHIC's claims adjustor wrote that "Mr. Maes would be glad to meet someone at the building if necessary and is very cooperative."

Ultimately, AMHIC issued payment to Summit in the amount of $321,069.00, reserving its rights to deny coverage under, inter alia, the applicable Policy provisions related to the production of information following a claim.  This sum represented AMCHIC's reckoning of the losses due to vandalism and malicious mischief, as well as losses due to the burglars' breaking in and exiting of the building, which is covered under the exception to the exclusion of the vandalism provision.  Because the Policy excludes coverage for loss by theft, AMHIC denied coverage for amounts requested by Summit which appeared to its investigators to be the result of theft or directly caused by attempts to steal and remove items from the Property.  The investigation also revealed that there had been an earlier event in December 2010 where juveniles had vandalized the building. AMHIC believed and communicated to Summit that at least some portion of the damages included in the $321,069.00 payment was caused in that event. AMHIC paid this amount without assessing a separate deductible for this separate event.  I have previously ruled

that AMHIC's denial of coverage for losses resulting from the theft or directly caused by attempts to steal and remove items from the Property was lawful.

## IV.   DISCUSSION

AMHIC argues that Summit's claims must fail because it failed to comply with the Policy terms.  Specifically, AMHIC contends Summit 1) did not "secure the Property; 2) did not conduct "periodic inspections" of the Property; and 3) did not provide requested documents.

### A.   Summary Judgment is not available to determine whether the Property was "secure" or "periodically inspected" under the Policy Terms.

The Policy does not define "secure" or "periodic inspections." An undefined term is to be given its "plain, ordinary meaning and interpreted according to the understanding of the average purchaser of insurance." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617 (Colo. 1999).While courts often give meaning to undefined insurance policy terms by way of dictionary consultation, I find here that the relevant dictionary entries are too general to be useful.

The verb "secure" is defined "to free from danger or harm; make safe." Dictionary.com Unabridged. Random House, Inc. http://dictionary.reference.com/browse/secure (accessed: July 7, 2014). The necessary measures one must take to ensure that a thing (whether tangible or intangible, as in a patented idea) or person is "secure" however, vary depending on what is to be secured. For example, a shoe may be fairly said to be "secured" to one's foot by Velcro®.  The

ball of a wrecking crane, on the other hand, may not be fairly said to be "secured" to the crane by Velcro®.

Pointing out that the Property once was protected by, inter alia, video surveillance and magnetic locks, but was secured by considerably more vulnerable means such as chains with padlocks and under no surveillance, whether man or machine, at the time of the Incident, AMHIC posits that the Property was not "secured" as required by the Policy.  That the Property may have been *less* secure than it once was does not mean, however, that it was *un*secure at the time of the burglary as a matter of law.  If properties could be truly secure in the dictionary sense of "free from harm or danger" then the Policy would be an illusory contract because it would be providing coverage for a risk—burglary—that cannot exist; one cannot successfully burglarize a property truly "secure." AMHIC could have but did not specify the method or manner by which its insured was to have secured the Property.

Crucially, it is not as though CCW failed entirely to take security measures.  Both sides rely on Mr. Maes's testimony and he clearly articulates specific security measures that CCW took to prevent unauthorized persons from entering the Property.  Because the Policy does not define "secure" or describe the duties and responsibilities attendant to what would have made the Property "secure" under the Policy, Mr. Maes's testimony establishes a genuine dispute of material fact regarding whether the Property was secure.

 "Periodic" is defined primarily as "occurring or appearing at regular intervals." Dictionary.com Unabridged. Random House, Inc.

http://dictionary.reference.com/browse/periodic (accessed: September 24, 2013).  The

period of time that elapses between intervals, however, is not part of the definition. Both

fruit flies and locusts may fairly be said to reproduce at "periodic intervals," but the time

in between intervals for some species of fruit flies is 60 hours and the time in between

intervals for some species of locusts is 17 years. Thus, again, the Policy has employed

language that is dependent upon broader context to arrive at its appropriate meaning.

As with "secure," AMHIC could have but did not narrow the definition of "periodic."

It could have but did not specify how often the required inspections must take place.

AMHIC offers only argument of counsel and speculation that more frequent inspections

"possibly" or "likely" could have limited the damage, but the law deals only in

probabilities and reasonably established fact, not possibility or speculation. *Dilts v.*

*Baker*, 427 P.2d 882, 884 (Colo. 1967). Because there is no Policy definition for

"periodic inspection" and Mr.Maes has testified that he routinely inspected the Property,

there is a genuine dispute of material fact regarding whether the Property was

periodically inspected per Policy terms and summary judgment is therefore inappropriate.

*B.  The "no action" clause does not bar Summit's claims.*

As mentioned above, the Policy contained a clause that required, as part of the claims

process after a loss, that Summit "produce for examination, with permission to copy, all

records and documents that we [AMHIC] may require." The Policy further provides that

"No action shall be brought unless there has been compliance with the policy provisions

and the action is started within one year after the loss."

AMHIC argues that because Summit did not produce documentation relating to

security specifically in response to the November 8, 2011, February 6, 2012, February 21, 2012, February 24, 2012, March 20, 2012, and September 10, 2012 letters, it has run afoul of the "produce for examination" provision.  AHMIC then asserts that the "no action" clause is a condition precedent to Summit filing *any* suit, including this one bringing a claim for bad faith, and that because Summit has, in AHMIC's estimation, failed to produce the requested documentation, Summit is barred from bringing suit until it has complied with AMHIC's requests.  Because AHMIC is mistaken in characterizing the "no action" clause as a condition precedent clause defeating a *bad faith* claim, the bad faith claim proceeds.  Because there are genuine disputes of material fact regarding whether Summit complied with the "produce for examination" provision, the remainder of Summit's claims may also proceed.

In *Emenyonu v. State Farm Fire and Casualty Company*, 885 P.2d 320, 323-24 (Colo. App. 1994), the Colorado Court of Appeals dealt with "no action" language nearly identical[2] to that presented in this case and rejected the insurer's argument that it prohibited the insured from asserting her bad faith claim, reasoning that in first-party bad faith actions, it is the conduct of the insurer that is at issue, not that of the insured.

The Colorado Court of Appeals stated,

> the suit-limitation provision by its terms cannot apply to a tort action based on bad faith.... [The provision] requires proof that there has been compliance with the policy provisions. However, the basis for a first-party bad faith claim is the conduct of the insurer,

---

[2] The policy provision in *Emenyonu* differs only in that its temporal component was set forth in an independent sentence.  The provision in *Emenyonu* reads: "No action shall be brought unless there has been compliance with the policy provisions. The action must be started within one year after the date of loss or damage." AMHIC's Reply incorrectly posits that the pertinent policy langue in *Emenyonu* is broader than that at issue here and misstates the case's crucial holding.

> not that of the insured. The language in the suit-limitation provision
> requiring compliance with policy conditions is more akin to that
> used in an action under the policy than to an action brought on a
> bad faith claim.

*Emenyonu*, 885 P.2d at 323–24 (internal quotation marks and citations omitted); *see also*

*Flickinger v. Ninth Dist. Prod. Credit Assoc.*, 824 P.2d 19, 24–25 (Colo.Ct.App.1991)

(similarly holding).  "[A] tort of bad faith is a tort independent of the policy because its

origins are not in the contract but in the common law imposition of good faith and fair

dealing, the breach of which fiduciary duty may be considered an independent tort."

*Christiansen v. First Insurance Company of Hawaii, Ltd.*, 88 Hawai'i 442, 967 P.2d 639

(App.1998).  Summit has asserted a first-party bad faith claim based on AMHIC's

conduct in allegedly unreasonably denying the majority of Summit's claim and such a

claim may not be constrained by the language of the "no action" clause present in the

parties' policy.

Regarding the other, contract based claims, AMHIC is not entitled to summary

judgment because AMHIC's contention that Summit "provided no requested information

prior to litigation" is vitiated by AMHIC's own records.  AMHIC's first written request

for information came on November 8, 2011. But weeks before, as described above,

Summit and CCW freely disclosed information to AMHIC and provided AMHIC with

access to the Property. For example, it was on October 17, 2011, that Mr. Maes toured

the property with AMHIC's claims adjustor.  Given this and other facts, most of which

come directly from AMHIC's own records, AMHIC cannot make a colorable argument

that Summit "failed to cooperate."

While "recovery under an insurance policy may be forfeited when, in violation of a policy provision, the insured fails to cooperate with the insurer in a material and substantial respect," *Hansen v. Barmore*, 779 P.2d 1360, 1364 (Colo.App.1989) (internal quotation marks and citation omitted), "non-cooperation constitutes breach only if material and substantial disadvantage to the insurer is proved." *Id.* at 1364. In addition, the question of whether the insured failed to cooperate with the insurer is a question of fact for the trial court. *Farmers Automobile Inter–Insurance Exchange v. Konugres*, 119 Colo. 268, 202 P.2d 959 (1949). Here, the facts relating to cooperation and its degree are disputed and AMHIC has made no assertion that it was substantially disadvantaged by Summit's failure to provide documentation about security at the Property. Accordingly, Summit's contract claims are unsuitable for summary judgment at this time.

## V.    CONLCLUSION

For the foregoing reasons, I DENY AMHIC's Motion for Summary Judgment, Doc. 55.

DATED:      October 9, 2014                    BY THE COURT:

                                               *s/John L. Kane*
                                               John L. Kane, U.S. Senior District Judge